**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

**DAVID CHRISTOPHER GALVAN,**

          **Plaintiff,**             **CIVIL ACTION NO. 13-cv-14150**

        **v.**                **DISTRICT JUDGE ROBERT H. CLELAND**

**COMMISSIONER OF**          **MAGISTRATE JUDGE MONA K. MAJZOUB**
**SOCIAL SECURITY,**

          **Defendant.**

_____/

**REPORT AND RECOMMENDATION**

Plaintiff David Christopher Galvan seeks judicial review of Defendant Commissioner of Social Security's determination that he is not entitled to social security benefits for his mental impairments under 42 U.S.C. §§ 405(g) and 1383(c)(3). (Docket no. 1.) Before the Court are Plaintiff's Motion for Summary Judgment (docket no. 14) and Defendant's Motion for Summary Judgment (docket no. 16). Plaintiff also filed a response to Defendant's motion. (Docket no. 17.) The motions have been referred to the undersigned for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). (Docket no. 4.) The undersigned has reviewed the pleadings, dispenses with a hearing pursuant to Eastern District of Michigan Local Rule 7.1(f)(2), and issues this Report and Recommendation.

**I.     RECOMMENDATION**

For the reasons stated herein, Plaintiff's Motion for Summary Judgment (docket no. 14) should be GRANTED IN PART and DENIED IN PART, and Defendant's Motion for Summary Judgment (docket no. 16) should be DENIED. This matter should be remanded for proper

consideration and discussion of the opinions of Plaintiff's treating physicians from the Lenawee Community Mental Health Authority.

## II.     PROCEDURAL HISTORY

Plaintiff filed applications for a period of disability, disability insurance benefits, and supplemental security income with a protective filing date of June 29, 2010, alleging disability beginning May 2, 2008,[1] due to panic disorder, obsessive-compulsive disorder, and personality disorder. (*See* TR 17, 200.) The Social Security Administration denied Plaintiff's claims on January 19, 2011, and Plaintiff requested a *de novo* hearing. (TR 17.) On March 20, 2012, Plaintiff appeared with a representative and testified at the hearing before Administrative Law Judge (ALJ) Susan Wakshul. (TR 17, 27.) In an April 27, 2012 decision, the ALJ found that Plaintiff was not entitled to benefits because he was capable of performing past relevant work as a factory worker and a significant number of jobs in the national economy. (TR 17-27.) The Appeals Council declined to review the ALJ's decision (TR 1-5), and Plaintiff commenced this action for judicial review. The parties then filed cross motions for summary judgment, which are currently before the Court.

## III.    HEARING TESTIMONY AND MEDICAL EVIDENCE

### A.     Plaintiff's Testimony

Plaintiff was 36 years old at the time of the administrative hearing and 33 years old on the amended alleged onset date. (TR 40.) Plaintiff testified that he was single and had no children. (TR 40-41.) Plaintiff explained that he was currently in jail and had been released for the day to attend the hearing. (TR 42-43.) He said that he went to jail on May 20, 2011, and would be released on

---

[1]Plaintiff later amended his alleged onset date to February 22, 2010 (TR 194); however, the ALJ "considered the entire period of disability as originally alleged as well as the medical records in relation to the claimant's condition from May 2, 2008 through the [date of her decision]." (TR 17.)

2

May 16, 2012.  (TR 42, 43.)   Plaintiff testified that he was otherwise living with his mother and

father in their house.  (TR 41.)  Plaintiff said that he didn't have a current source of income, but he

was receiving food stamps.  (TR 41.)  Plaintiff stated that he lost his driver's license in 2007 or 2008

because he had DUIs and had to pay Michigan driver's responsibility fees.  (TR 41.)  Plaintiff

elaborated that his parents would drive him around.  (TR 41.)  Plaintiff testified that he had a GED

and was certified as a nurse's aide, but let that certification expire in 1998.  (TR 43-44.)

Plaintiff described his last position at a security company in 2008 as one in which he would

go to a hotel and "just kind of walk around with [his] uniform on."  (TR 44.)  He said that he worked

there 16 hours per week on the weekends.  (TR 44.)  Plaintiff clarified that he was working 40 hours

per week when he first started working there, but he started having some panicky issues, so he

reduced his hours.  (TR 44.)  He said that he worked there for about four months.  (TR 45.)  Plaintiff

testified that he worked at a pontoon boat factory for six months repairing pontoon boats.  (TR 45.)

Plaintiff also described working for a temp agency where he received one job every few months for

a week or two, which was mainly factory work.  (TR 45.)  Plaintiff told the ALJ that he also worked

at a phone solicitor company for about three months.  (TR 45.)  Plaintiff told his attorney that he

worked at the phone solicitor company 40 hours per week for about two months, but it ended

because he couldn't handle sitting at a table with five people and talking on the phone.  (TR 64.)

Plaintiff said that he did not think that he would  be able to do that job even if he were alone in the

room because he would start to get antsy after two hours.  (TR 64-65.)   Plaintiff also admitted to

working at a security company, where he essentially worked in a security booth and watched

movies.  (TR 45-46.)  Plaintiff said that he wouldn't be able to do the security booth work anymore

because he would get overwhelmed after being there for two hours.  (TR 63.)  Plaintiff further

described working for a handful of retirement communities and nursing homes, at which he did

3

various tasks such as cook and help residents get in and out of their wheelchairs.  (TR 46-47.)

Next, the ALJ asked Plaintiff why he could not work, aside from the fact that he was in jail. (TR 48.)  Plaintiff explained that he had a really hard time being "out in anywhere."  (TR 48.)  He described being so anxious in the video store that he couldn't even go there anymore.  (TR 48.)  He claimed that he had been hospitalized in the emergency room because he thought that he was having seizures but was told that it was only anxiety.  (TR 48-49.)  He said that he felt anxious all the time, even when he was doing nothing, and that the only thing he could do was sit down somewhere.  (TR 49.)  Plaintiff explained that when he went to the grocery store, his panic would increase the further he went into the store to the point where he would have "real bad physical symptoms."  (TR 49.) Plaintiff said that he would have to sit down on the floor of the store until he could get up and walk out, leaving his items in the store because he couldn't handle being in there.  (TR 49.)  Plaintiff testified that he couldn't think straight at all – that his mind was just gone.  (TR 49.)  Plaintiff explained he had trouble reaching his community service hours because he would start to get antsy and would have to leave.  (TR 49.)  Plaintiff added that it was a struggle for him riding the elevators up to the hearing room that day.  (TR 49.)

Plaintiff testified that his treatment in jail consisted of medication.  (TR 49-50.)  He said that before he went to jail, he was going to Community Mental Health, and all they did there was give him medication.  (TR 50.)  Plaintiff elaborated that Community Mental Health did not offer counseling.  (TR 50.)  Plaintiff explained that he was taking Klonopin, Luvox, and Vistaril in jail. (TR 50.)  He said that those medications didn't work for him the same way that they used to when he was 19 years old.  (TR 49, 50.)  He further explained that when he had his medication, he was really bad, but when he didn't have it, he wouldn't be able to leave his room.  (TR 50.)  Plaintiff testified that the medications he was on before he went to jail, Klonopin and Luvox, worked about

4

the same.  (TR 50.)  Plaintiff claimed that he still felt anxious all the time; he said that he slept 18 hours a day in jail because being awake was too much for him because he had to think of everything going on around him.  (TR 51.)  Plaintiff testified that one of the side effects of his medication is seizures.  (TR 51.)  Plaintiff added that he thought that he had a seizure, but he was told at the hospital that it was just an anxiety attack.  (TR 51.)

Plaintiff testified that he had nine inpatient mental health hospitalizations between 1997 and 2000.  (TR 51, 52.)  He said that he received mental health therapy in the hospital from a few different doctors, but he stopped going because when he was in their rooms, he felt like he was crawling out of his body and just couldn't escape.  (TR 52.)  Plaintiff repeated that Community Mental Health did not offer him mental health counseling and averred that he definitely did not reject it.  (TR 53-54.)  Plaintiff explained that it was never offered to him because he didn't have insurance – that they didn't offer him anything extra, just the medication.  (TR 54.)

With regard to his memory, Plaintiff testified that there are certain things that he could remember, such as what show or song was on or the name of a person in a movie, but when it came to anything other than that, his mind was "gone" and "completely blank."  (TR 54.)  Plaintiff then testified that he didn't really have any concentration.  (TR 54.)  He described himself as being on autopilot all the time.  (TR 54.)  Plaintiff said that when he watched television, he would watch pretty much anything because TV was his only escape.  (TR 54.) Plaintiff claimed that after he watched a television show, he wouldn't be able to tell the ALJ what happened.  (TR 55.)  With regard to understanding information and instructions, Plaintiff testified that he wouldn't be able to remember a simple grocery list; Plaintiff added that he could write the list down but admitted that he probably wouldn't do so.  (TR 55.)  Plaintiff testified that he usually let other people make decisions and that he followed them.  (TR 55-56.)

5

Plaintiff told the ALJ that he didn't like to be in any kind of social situation. (TR 56.) He explained that when they had family gatherings, he would grab his plate and eat his food in his room. (TR 56.) Plaintiff's idea of socializing was the few minutes that he was out of his room either fixing his plate or disposing of it. (TR 56.) Plaintiff described his anxiety attacks as:

> Like sometimes I can't be around too many people, so I'll go be by myself. But when I'm by myself, then it's even worse and I have to go be around some people. So it's like I need a mix of both, because too much of one is too much, and too much of the other is too much, so I need a little bit of both.

(TR 56-57.) Plaintiff testified that he had his last anxiety attack when he was in the elevator on his way up to the hearing. (TR 57.) Plaintiff said that he dealt with it by backing up against the wall and focusing on the "thing that was going up" instead of what was going on around him. (TR 57.) Plaintiff then mentioned that he attempted suicide in the 1990's and was subsequently hospitalized for depression. (TR 57.) He then confirmed that anxiety was the major component of what was wrong with him, not the depression, but he added that his doctors said that he suffered from anxiety because of the underlying depression. (TR 57.) Plaintiff testified that his problems started when he was 14 years old, but doctors weren't able to find anything wrong with him. (TR 58.) He said that nobody ever mentioned anything about "mental health stuff" to him until he got older, so when he was 19 years old, he checked into it himself. (TR 58.) Plaintiff testified that his medication has relieved some of his symptoms; specifically he said that he no longer hears voices. (TR 58-59.) When asked whether any of his mental health treatment made him feel like he was getting better, Plaintiff said yes, in the early 1990's. (TR 63.)

Next, Plaintiff and the ALJ discussed Plaintiff's incarcerations. (TR 59.) Plaintiff said that he was currently in jail for aggravated assault. (TR 59.) Plaintiff then explained that in 1997, he got in trouble for a DUI and a separate assault charge, for which he was incarcerated for one year.

6

(TR 59.)  Plaintiff elaborated that he stayed out of trouble from 1999 to 2006 but then got into some more trouble.  (TR 59.)  Plaintiff also admitted to serving time from March 2009 through February 2010 for drunk driving offenses.  (TR 66-67.)  Plaintiff told the ALJ that the assault charges were not caused by an anger component of his symptoms.  (TR 59.) He then explained that his first assault charge resulted from his brother's hand being cut when his brother pulled a knife out of Plaintiff's hand to prevent Plaintiff from cutting himself.  (TR 59-60.)  Plaintiff said that his second assault charge stemmed from his girlfriend hitting him and Plaintiff hitting her back.  (TR 60.)

On a typical day when Plaintiff was not in jail, Plaintiff testified that he would wake up, use the rest room, shower, eat breakfast, and watch television.  (TR 60.)  Plaintiff testified that a typical day in jail consisted of him sleeping all night, waking up to eat breakfast, going back to bed, waking up to eat lunch, going back to bed, waking up to eat dinner, and then staying awake until lockdown.  (TR 61.)  He told his attorney that he would eat his meals in his room.  (TR 66.)  Plaintiff reasoned that there was a lot of people in jail, and he could only tolerate being around them for about two and a half hours.  (TR 61.)  Plaintiff admitted that he would play cards with one or two fellow inmates in the evening.  (TR 65-66.)  Plaintiff also said that he would read in his cell for about a half hour; after that he would just stare at the words, unable to comprehend what he was reading.  (TR 66.)

Plaintiff testified that he didn't have any trouble sleeping, as long as he took his medication.  (TR 61.)  He told the ALJ that his personal hygiene was not as good as it used to be, maybe because the water in jail wasn't very good.  (TR 61.)  Plaintiff claimed that before he went to jail, he would do household chores, such as vacuum, take out the trash, and cook, but not laundry.  (TR 61-62.)  Plaintiff said that his parents would grocery shop for him.  (TR 62.)  Plaintiff further testified that he did not visit family or friends, go to a house of worship, go out for lunch or dinner, go fishing or hunting, go to the mall, take walks, or do anything else outside the home because he was out of his

element, uncomfortable, and anxious. (TR 62.)

When questioned by his attorney, Plaintiff described the period between February 2010 through May 2011, when he was not in jail. (TR 67.) Plaintiff said that he was having a hard time and had some emergency room trips to the hospital for anxiety. (TR 67.) He explained that was living at a homeless shelter and at his uncle's house during this time because his parents didn't want to drive him back and forth to Alcoholics Anonymous; Plaintiff said that he was not drinking during this time. (TR 67-68.) During that period, Plaintiff also moved into a house with his girlfriend, and they were fixing it up. (TR 68.) Plaintiff said that he was only able to work on the house for two or three hours at a time because he could only concentrate for that long. (TR 68-69.) Plaintiff admitted that he was also looking for part-time work during this time. (TR 69.) Plaintiff said that he was hoping to find work at McDonald's, at a restaurant doing dishes, or at Goodwill. (TR 69.) Plaintiff told his attorney that he had an interview at Goodwill, but he didn't get the job. (TR 69.) Plaintiff testified that he eventually had a six pack of beer on one occasion, even though he wasn't supposed to be drinking. (TR 70.) While he was drinking that six pack, he got into an altercation with his girlfriend, which let to the assault charge and his current jail sentence. (TR 70-71.)

With regard to his medications, Plaintiff told his attorney that his medications used to work a lot better for him when he was younger. (TR 71.) Plaintiff testified that he was not able to take Klonopin in jail because it was a prohibited medication; instead, Plaintiff said that he took Vistaril, a medication similar to Benadryl, which was supposed to help calm him and help him sleep. (TR 71-72.) Plaintiff explained that the Vistaril helped him, but he was still anxious most of the time. (TR 72.) Plaintiff told his attorney that the anxiety he had most of the time was different than his panic attacks. (TR 72.) Plaintiff described his panic attacks as "when everything starts rushing" and feeling like he was having a heart attack to the point where he would have to do something to

8

distract himself and shake himself out of it. (TR 72.) Plaintiff stated that he if he was out in public, going to work, or breaking from his routine, he would have a panic attack up to five times per day. (TR 73.) Lastly, Plaintiff testified that there hadn't been any times since February 2010 that he could have worked on a full-time basis. (TR 74.)

### B. Vocational Expert's Testimony

First, the Vocational Expert (VE) classified Plaintiff's past work as a factory worker as unskilled with an SVP of 1 at the medium exertional level; a pontoon boat fixer at a higher SVP of at least 2 or 3; a resident care assistant as skilled with an SVP of 6 at the medium exertional level; a certified nursing assistant as semiskilled with an SVP of 4 at a medium exertional level; a security guard as semiskilled with an SVP of 3 at the light exertional level; a security worker where he sat in a booth as more of a sedentary position; and a telephone solicitor as semiskilled with an SVP of 3 at the sedentary exertional level. (TR 75-76.)

Next, the ALJ asked the VE whether a hypothetical person of the same age, education, and work experience as Plaintiff who was capable of performing work at all exertional levels but was limited to simple, routine, and repetitive tasks, occasional and superficial interaction with others, low stress as defined as no production-paced work, occasional changes to the work setting, occasional use of judgment, and occasional decision-making could perform Plaintiff's past work. (TR 76-77.) The VE testified that such an individual may be able to perform Plaintiff's past work as a factory worker and would also be able to perform other unskilled work at the medium exertional level such as a vehicle washer, for which there were 288,111 positions available nationally, 7,580 positions available in the state of Michigan, and 1,220 positions available regionally, the region being defined as the Detroit, Livonia, and Dearborn, Michigan metropolitan division area; a hand packer, for which there were 676,870 positions available nationally; 19,830 positions available in

the state of Michigan, and 2,870 positions available regionally; and a laundry worker, for which there were 204,820 positions available nationally, 5,870 positions available in the state of Michigan, and 1,016 positions available regionally. (TR 77-78.)          The ALJ then asked the VE whether her answers would change if the hypothetical were changed a bit to where the work would be essentially isolated with no more than occasional supervision. (TR 78.) The VE responded that her answers would not change. (TR 78.)

Next, the ALJ asked the VE to explain what employers customarily expect in terms of breaks, absences, and on-task time. (TR 78.) The VE explained that most employers will allow a 15-minute break at the beginning of the shift, a 15-minute break at the end of the shift, and a meal break in the middle of the shift, which could last anywhere from a half hour to an hour. (TR 78.) She said that as far as absences go, most employers would allow absences two days a month, and some extremely generous employers would allow three days of absence, but that would exhaust that employee's  annual leave, sick leave, and personal leave. (TR 78.) The VE advised that an employer will usually tolerate up to ten percent of off-task time, but if it were anything more than that, the employee would begin to endanger his ability to maintain employment. (TR 79.) Finally, the ALJ asked the VE if there would be any positions available to an individual if he would need breaks, absences, or off-task time in excess of her testimony. (TR 79.) The VE responded that there would not be any positions available for such an individual. (TR 79.)

### C.      Medical Record

Plaintiff (docket no. 14 at 7-9) and Defendant (docket no. 16 at 10-14) each set forth a factual background related to Plaintiff's medical record. Although focused on different portions of the record, the Court finds that there are no significant inconsistencies between the two accounts; thus, the Court will incorporate them by reference herein. The undersigned has, however, conducted an

10

independent review of Plaintiff's medical record and will include comments and citations as necessary throughout this Report and Recommendation.

## IV.   ADMINISTRATIVE LAW JUDGE'S DETERMINATION

The ALJ found that Plaintiff had not engaged in substantial gainful activity since the original alleged onset date of May 2, 2008, and that Plaintiff suffered from the following severe impairments: depression, anxiety, and substance abuse.  (TR 19.)  The ALJ also found, however, that Plaintiff's impairments did not meet or medically equal the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (TR 20-21.)  The ALJ then found that Plaintiff had the following residual functional capacity (RFC):

> [T]he claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: simple, routine, repetitive tasks; work would be essentially isolated with no more than occasional supervision; and low stress as defined as no production paced work, occasional changes to work setting, occasional use of judgment, and occasional decision making.

(TR 21-24.)  Subsequently, in reliance on the VE's testimony, the ALJ determined that Plaintiff was capable of performing his past relevant work as a factory worker and a significant number of other jobs in the national economy.  (TR 24-26.)  Therefore, the ALJ found that Plaintiff was not disabled under the Social Security Act at any time from May 2, 2008, through the date of the ALJ's decision. (TR 26.)

## V.   LAW AND ANALYSIS

### A.   Standard of Review

Pursuant to 42 U.S.C. § 405(g), this Court has jurisdiction to review the Commissioner's final decisions.  Judicial review of the Commissioner's decisions is limited to determining whether his findings are supported by substantial evidence and whether he employed the proper legal

11

standards.  *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Walters v. Comm'r*, 127 F.3d 525, 528 (6th Cir. 1997).  Substantial evidence is more than a scintilla but less than a preponderance; it is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson*, 402 U.S. at 401 (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *Walters*, 127 F.3d at 528.  It is not the function of this Court to try cases *de novo*, resolve conflicts in the evidence, or decide questions of credibility.  *See Brainard v. Sec'y of Health and Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

In determining the existence of substantial evidence, the court must examine the administrative record as a whole.  *See Kirk v. Sec'y of Health and Human Servs.*, 667 F.2d 524, 536 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983).  If the Commissioner's decision is supported by substantial evidence, it must be affirmed, even if the reviewing court would decide the matter differently, *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983), and even if substantial evidence also supports the opposite conclusion.  *See Her v. Comm'r*, 203 F.3d 388, 389-90 (6th Cir. 1999); *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts").

### B.     Framework for Social Security Determinations

Plaintiff's Social Security disability determination was made in accordance with a five-step sequential analysis.  In the first four steps, Plaintiff was required to show that:

(1)     Plaintiff was not presently engaged in substantial gainful employment; and

(2)     Plaintiff suffered from a severe impairment; and

(3)     the impairment met or was medically equal to a "listed impairment;" or

(4)     Plaintiff did not have the residual functional capacity (RFC) to perform relevant past

work.

*See* 20 C.F.R. § 404.1520(a)-(f). If Plaintiff's impairments prevented Plaintiff from doing past work, the Commissioner, at step five, would consider Plaintiff's RFC, age, education, and past work experience to determine if Plaintiff could perform other work.  If not, Plaintiff would be deemed disabled.  *See id.* at § 404.1520(g).  The Commissioner has the burden of proof only on "the fifth step, proving that there is work available in the economy that the claimant can perform." *Her*, 203 F.3d at 391.  To meet this burden, the Commissioner must make a finding "supported by substantial evidence that [the claimant] has the vocational qualifications to perform specific jobs." *Varley v. Sec'y of Health and Human Servs.,* 820 F.2d 777, 779 (6th Cir. 1987).  This "substantial evidence" may be in the form of vocational expert testimony in response to a hypothetical question, "but only 'if the question accurately portrays [the claimant's] individual physical and mental impairments.'" *Id.* (citations omitted).

## C.    Analysis

The Social Security Act authorizes "two types of remand: (1) a post judgment remand in conjunction with a decision affirming, modifying, or reversing a decision of the [Commissioner] (a sentence-four remand); and (2) a pre-judgment remand for consideration of new and material evidence that for good cause was not previously presented to the [Commissioner] (a sentence-six remand)." *Faucher v. Sec'y of Health and Human Servs.*, 17 F.3d 171, 174 (6th Cir. 1994) (citing 42 U.S.C. § 405(g)).  Under a sentence-four remand, the Court has the authority to "enter upon the pleadings and transcript of the record, a judgment affirming, denying, or reversing the decision of the [Commissioner], with or without remanding the cause for a hearing.  42 U.S.C. § 405(g).  Where there is insufficient support for the ALJ's findings, "the appropriate remedy is reversal and a sentence-four remand for further consideration." *Morgan v. Astrue*, 10-207, 2011 WL 2292305, at

13

*8 (E.D.Ky. June 8, 2011) (citing *Faucher*, 17 F.3d at 174).

Plaintiff asserts that this matter should be reversed and remanded under sentence four because the ALJ's opinion "rejects the opinions of treating physicians without good reason, rejects the opinions of a[] consultative examiner for equally invalid reasons, and ultimately adopts only the inconsistent opinion of a non-examining consultant who had not even seen the entire record." (Docket no. 14 at 11-15.)

### 1. *Plaintiff's Treating Physicians*

With regard to Plaintiff's treating physicians at the Lenawee Community Mental Health Authority (LCMHA), Plaintiff alleges that the ALJ discounted their opinions for two reasons: "(1) a lack of 'a separate narrative regarding the claimant's functioning' and (2) GAF scores she felt were consistent with her findings (Tr 23)." (Docket no. 14 at 11.) Plaintiff argues that neither of these reasons is a "good" reason. (*Id*.)

The ALJ must give a treating physician's opinion complete deference if it is supported by clinical and laboratory diagnostic evidence and it is not inconsistent with the other substantial evidence in the record. 20 C.F.R. § 404.1527(c)(2). It is equally well settled that the ultimate issue of disability is reserved to the Commissioner and not the treating or examining physician. *Kidd v. Comm'r*, 283 Fed. Appx. 336, 341 (6th Cir. 2008). Thus, when a medical or non-medical source offers an opinion on "an issue reserved to the Commissioner, such as whether the claimant is disabled, the ALJ need not accord that opinion controlling weight." *Id.* (citing *Bass v. McMahon*, 499 F.3d 506, 511 (6th Cir. 2007)). The opinion of an examining source is generally accorded more weight than is the opinion of a source who did not examine the claimant. 20 C.F.R. § 404.1527(c)(1). The opinion of a state agency medical or psychological consultant is reviewed in the same manner as is the opinion of a nonexamining physician or psychologist. 20 C.F.R.

14

§404.1527(e).

The Commissioner requires its ALJs to "always give good reasons in [their] notice of determination or decision for the weight [they] give [a] treating source's opinion." 20 C.F.R. § 404.1527(c)(2). Those good reasons must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Wilson v. Comm'r*, 378 F.3d 541, 544 (6th Cir. 2004) (citing Social Security Ruling (SSR) 96-2p, 1996 WL 374188, at *5 (1996)). If the opinion of a treating source is not afforded controlling weight, an ALJ must apply certain factors in determining what weight to give the opinion, including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source. *Wilson*, 378 F.3d at 544 (citation omitted). Even then, a finding that a treating-source medical opinion is not well supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to controlling weight, not that the opinion should be rejected. Social Security Ruling (SSR) 96-2p, 1996 WL 374188, at *4.

Additionally, the Sixth Circuit has upheld the decision of an ALJ which gave less than controlling weight to a treating physician without specifically analyzing the factors set forth in 20 C.F.R. § 404.1527(c) where the ALJ provided "good reason" for the decision. *See Infantado v. Astrue*, 263 Fed.Appx. 469, 473-74 (6th Cir. 2008). There is no per se rule that requires an articulation of each of the six regulatory factors listed in 20 C.F.R. § 404.1527(c)(2)-(6). *Norris v. Comm'r*, No. 11-11974, 2012 WL 3584664, at *5 (E.D. Mich. Aug. 20, 2012) (citing *Tilley v. Comm'r*, 394 Fed. Appx. 216, 222 (6th Cir. 2010)). Yet, "a failure to follow the procedural

15

requirement of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight accorded the opinions denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 243 (6th Cir. 2007).

The Sixth Circuit has suggested, however, that an ALJ's failure to discuss the factors of § 1527(c)(2)-(6) may constitute harmless error (1) if "a treating source's opinion is so patently deficient that the Commissioner could not possibly credit it;" (2) "if the Commissioner adopts the opinion of the treating source or makes findings consistent with the opinion;" or (3) "where the Commissioner has met the goal of [Section 1527(c)]—the provision of the procedural safeguard of reasons—even though she has not complied with the terms of the regulation." *Nelson v. Comm'r*, 195 Fed. Appx. 462, 470 (6th Cir. 2006) (citing *Wilson*, 378 F.3d at 547).

The medical record indicates that Plaintiff met with four different LCMHA psychiatrists several times over a span of approximately two years, from August 10, 2009, to June 6, 2011. (TR 394-444, 449-461.) The parties do not dispute that these psychiatrists were Plaintiff's treating physicians. The LCMHA medical records consist almost exclusively of five-page Medication Review Notes, which document each of Plaintiff's visits. Specifically, the Medication Review Notes document Plaintiff's diagnoses, Plaintiff's statements with regard to his symptoms, Plaintiff's prescribed medications, the psychiatrists' checkmark assessment of Plaintiff's mental status, the psychiatrists' numerical ratings of Plaintiff's various feelings, emotions, and hygiene, the psychiatrists' overall impressions of Plaintiff, and a recommended treatment plan.

Defendant argues that the LCMHA physicians did not provide any statements about Plaintiff's specific attributes or limitations. (Docket no. 16 at 17.) To the contrary, on July 22, 2010, Dr. Manish Prasad described Plaintiff as unstable and opined that Plaintiff's "[p]ersisting

16

severe symptoms of anxiety and [p]anic attacks with agoraphobia . . . severely affect his daily functioning." (TR 434.) A few weeks later, Dr. Prasad again noted that Plaintiff was unstable and surmised that "[s]everity [of] anxiety continues to affect [Plaintiff's] functioning including preventing him from leaving his house." (TR 439.) Dr. Prasad also found that Plaintiff's agoraphobia had worsened. (TR 439.) Additionally, in June 2011, Dr. Maureen Noble rated Plaintiff's anxiety as mild and stated that Plaintiff was worried frequently but was able to readily turn his attention to other things. (TR 456.)

With regard to this issue, the ALJ stated in relevant part:

Since the alleged onset date, the claimant has kept fairly regular appointments with his treating physicians and mental health professionals. Contrary to the claimant's allegations of disabling panic attacks, the progress notes document an overall stable mental state that has not worsen[ed] since the date the claimant stopped working. In particular, the notes reveal positive response to prescribed psychotropic medications which have effectively controlled the claimant's symptoms when he has been compliant. In fact, while the claimant previously experienced multiple hospitalizations for panic attacks, depression, and suicidal ideation, the evidence fails to show any such occurrence since 1999 (Exhibit 2F; 3F; 4F; 5F; 6F; 7F.)
. . . .

As for the opinion evidence, I considered the observations and conclusions of the consultative examiners as well as the assessments of the State agency consultant. Notably, the claimant's treating sources did not provide any narratives describing claimant's functioning.
. . . .

Although the claimant's treating sources did not provide a separate narrative regarding the claimant's functioning, the treatment notes indicate various GAF scores assigned throughout the alleged period of disability. Although there were a range of scores, the claimant's treating sources never assigned a GAF score below 55. Moreover, at one point, the claimant received GAF scores as high as 65 which is indicative of mild impairment of mental functioning (Exhibit 4F; 7F). The claimant's GAF scores are given some weight as they are consistent with the evidence of record which shows a stable mental state without significant or exacerbated symptoms which render the claimant incapable of functioning from a mental standpoint. Moreover, these score[s] are considered credible generally as they are assigned by the claimant's treating sources who have met with the claimant over a[n] extended duration.

17

(TR 22, 23.)

A plain reading of the ALJ's decision demonstrates that she did not assign any weight to the opinions of Plaintiff's LCMHA treating psychiatrists, except for the GAF scores that they assigned to Plaintiff.[2]  In fact, it is not clear whether the ALJ considered, or even recognized, their opinions, as the ALJ does not discuss or acknowledge them in her decision.  The ALJ's brief, two-sentence discussion of progress notes, which cites to the entire medical record, does not add clarity to this matter.  Furthermore, the ALJ's purported explanation for not crediting the treating physicians' opinions, that they did not provide a separate narrative regarding the claimant's functioning, is invalid, as there is no requirement that an opinion be presented in the form of a separate narrative.  The Court finds that the ALJ failed to provide good reasons for not assigning weight to Plaintiff's LCMHA treating physicians' opinions regarding Plaintiff's attributes and limitations.   The circumstances necessary under *Nelson* for the ALJ's failure to constitute harmless error do not exist here.   Therefore, the Court recommends remanding this matter for proper consideration and discussion of the opinions of Plaintiff's treating physicians from the Lenawee Community Mental Health Authority.  While such an order may ultimately be an exercise in formality, such a discussion is necessary for the Court to engage in meaningful appellate review.

Next, Plaintiff challenges the ALJ's assessments of the examining and non-examining State agency psychological consultants' opinions.   The undersigned acknowledges that the ALJ's assessments of these opinions may change upon remand after proper consideration and discussion of the LCMHA treating physicians' opinions.  However, the undersigned will review the ALJ's

---

[2]Plaintiff seemingly argues that the ALJ disregarded his treating physicians' opinions based on their GAF score assessments of Plaintiff.  (Docket no. 14 at 13.)  Actually, the ALJ found Plaintiff's treating physicians' GAF score assessments to be consistent with the record evidence and generally credible.  (TR 23.)  Plaintiff's argument fails with regard to this issue.

current assessments of the psychological consultants' opinions, as challenged by Plaintiff, in the case that they are not affected upon remand.

### 2.      *Dr. Bishop's Opinion*

Dr. Elizabeth S. Bishop, Ph.D., is a licensed psychologist who conducted a psychological evaluation of Plaintiff on January 7, 2011, with regard to his alleged disability. (TR 445-448.) The parties do not dispute that Dr. Bishop was not a treating physician, as she only saw Plaintiff once before she assessed limitations. The ALJ is not bound by a non-treating physician's opinion. *McKivens v. Comm'r of Soc. Sec.*, No. 11-cv-14268, 2012 WL 3263847, at *11 (E.D. Mich. Jul. 9, 2012) (citation omitted). However, "[w]hen no treating physician opinion has been granted controlling weight ... the medical opinion of a consultative examiner is to be weighed considering all of the factors identified in 20 C.F.R. § 404.1527(c)(1) through (6)." *Id.* (citing 20 C.F.R. § 404.1527(e)(2)(iii)). Nevertheless, there is no per se rule that requires an articulation of each of the six regulatory factors. *Norris v. Comm'r of Soc. Sec.*, No. 11-CV-11974, 2012 WL 3584664, at *5 (E.D. Mich. Aug. 20, 2012) (citing *Tilley v. Comm'r of Soc. Sec.*, 394 Fed. Appx. 216, 222 (6th Cir. 2010)).

The ALJ discussed Dr. Bishop's opinion as follows:

On January 7, 2011, Betty Bishop, Ph.D., met the claimant for a State agency consultative psychological evaluation. The claimant reported monthly office visits at Lenawee Community Mental Health and prescribed medications of Klonopin and Luvox. The claimant reported panic attacks when he leaves his house. The claimant stated that he has trouble with crowds. Findings on mental status examination were generally unremarkable. Dr. Bishop assigned the claimant a GAF score of 55 which is suggestive of moderate impairment of functioning. Dr. Bishop also opined that due to the claimant's panic attacks, agoraphobia, and possible personality disorder, the claimant is likely to find it difficult to maintain consistent employment (Exhibit 6F). I give some weight to the GAF score assigned by Dr. Bishop as it is consistent with the evidence of record which shows that while the claimant has some difficulties due to anxiety and substance abuse, [he] is neither disabled or unable to function from a mental standpoint. However, I give no weight to Dr. Bishop's

19

> opinion that the claimant is unable to maintain consistent employment as there are no objective findings either during the consultative evaluation or throughout the evidence of record as a whole to show an inability to sustain unskilled work activity within normal and customary tolerances.  In particular, such an opinion is inconsistent with the claimant's daily activities and the overall lack of subjective complaints or objective indicia during the claimant's office visits.

(TR 23.)   Because Dr. Bishop was not a treating medical source, the ALJ did not have to give full weight to her opinion.  Plaintiff argues that the ALJ should not have rejected Dr. Bishop's opinion solely due to a lack of objective laboratory findings.  (Docket no. 14 at 14.)  In fact, the lack of objective findings was not the ALJ's only reason for rejecting Dr. Bishop's opinion.  Here, in addition to discussing the supportability of Dr. Bishop's opinion, the ALJ discussed the consistency of Dr. Bishop's opinion in accordance with the fourth factor of 20 C.F.R. § 404.1527(c). Specifically, the ALJ found that Dr. Bishop's opinion was inconsistent with the claimant's daily activities and the lack of subjective complaints made by Plaintiff.  (TR 23.)  The undersigned finds that the ALJ did appropriately note, discuss, and explain why she did not fully credit Dr. Bishop's opinion.  Plaintiff's Motion should be denied with regard to this issue.

### 3.   Dr. Schirado's Opinion

Dr. William Schirado, Ph.D., a State agency psychological consultant, completed a mental residual functional capacity assessment of Plaintiff on January 18, 2011, based on a review of Plaintiff's record; Dr. Schirado did not personally examine Plaintiff.  (TR 85-95.)  Plaintiff challenges the ALJ's assignment of "great weight" to Dr. Schirado's opinion by asserting that Dr. Schirado is a non-examining source whose opinion is inconsistent with the record and not based a review of the entire record.  (Docket no. 14 at 14-15.)  Generally, the opinion of an examining source is afforded more weight than the opinion of a nonexamining source.   20 C.F.R. § 404.1527(c)(1).  However, an ALJ reviews the opinion of a nonexamining physician or psychologist

20

in the same manner as the opinion of an examining State agency medical or psychological consultant, by considering the factors identified in 20 C.F.R. § 404.1527(c)(1) through (6). 20 C.F.R. 404.1527(e).

In her decision, the ALJ discussed Dr. Shirado's opinion as follows:

> Dr. Schirado determined that the claimant is moderately limited with regards to maintaining concentration, but has not experienced substantial loss with regards to ability to understand, carry out, and remember simple instructions independently. Dr. Schirado also indicated that the claimant has not experience[d] substantial loss completing daily activities or the ability to sustain simple instructions independently. In addition, Dr. Schirado reported that there is no significant loss of managing social interactions or responding appropriately to supervision, coworkers, and work situations (Exhibit 3A). The assessment [o]f Dr. Schirado is consistent with the evidence of record which shows that the claimant's mental state is generally stable and controlled with medications. The assessment is also consistent with the evidence of record showing that the claimant is able to engage in various activities involving simple and unskilled tasks. As such, I give great weight to this assessment.

(TR 23.)

Plaintiff's argument that Dr. Schirado's opinion is inconsistent with the record fails. Plaintiff's argument in this regard is conclusory at best, as Plaintiff does not explain why Dr. Schirado's opinion is inconsistent with the record or cite to any record evidence with which it is inconsistent. The "'court is under no obligation to scour the record for errors not identified by [the] claimant.'" *Bush v. Astrue*, No. 12-11790, 2013 WL 1747807, *14 (E.D. Mich. Jan 25, 2013) (Grand, M.J.) (quoting *Martinez v. Comm'r of Soc. Sec.*, No. 09-13700 (E.D. Mich. Mar. 2, 2011)).

Plaintiff's argument that Dr. Schirado did not review the entire record also fails. Plaintiff asserts that a nonexamining source's opinion cannot be used to support an ALJ's decision denying benefits where it is not based on a review of the entire record, citing to *Barker v. Shalala*, 40 F.3d 789 (6th Cir. 1994) and *Jones v. Astrue*, 808 F. Supp. 2d 993 (E.D. Ky. Apr. 21, 2011). However, the *Barker* court does not set forth such a requirement; rather it recognizes and uses "access to the

21

entire medical record" as a factor in affirming the ALJ's reliance on a nonexaminer's opinion. *Barker*, 40. F.3d at 794.  In *Jones*, a non-binding opinion, the court opined that Social Security Ruling 96-6p suggests that when a nonexaminer's opinion is accorded more weight than an that of a treating source, "then the non-examiner should have reviewed a *complete* record which contains the opinion of a specialist in the claimant's particular impairment who had access to more detailed and comprehensive information than did the treating source."  *Jones*, 808 F. Supp. 2d at 998 (emphasis in original).  Actually, SSR 96-6p advises that a nonexaminer's "review of a complete case record that includes a medical report from a specialist in the individual's particular impairment which provides more detailed and comprehensive information than what was available to the individual's treating source" is an *example* of an appropriate circumstance in which to afford a nonexaminer's opinion more weight than an examiner's opinion.  SSR 96-6p, 1996 WL 374180, at *3 (emphasis added).  The authorities cited by Plaintiff do not support his argument; there is no such requirement that a nonexaminer's opinion be based on a review of the entire record in order to support an ALJ's decision denying benefits.  Furthermore, as Defendant points out, Plaintiff does not identify which "updated medical [records] produced at the hearing" were not reviewed by Dr. Schirado; the Court declines to speculate.

After a review of the entire record, the undersigned finds that the ALJ did appropriately note, discuss, and explain the weight she accorded to Dr. Schirado's opinion and that her decision in this regard is supported by substantial evidence.  Plaintiff's Motion should be denied with regard to this issue.

## VI.     CONCLUSION

For the reasons stated herein, the undersigned recommends that Plaintiff's Motion for Summary Judgment (docket no. 14) be GRANTED IN PART and DENIED IN PART, Defendant's

Motion for Summary Judgment (docket no. 16) be DENIED, and this matter be remanded for proper consideration and discussion of the opinions of Plaintiff's treating physicians from the Lenawee Community Mental Health Authority.

## REVIEW OF REPORT AND RECOMMENDATION

Either party to this action may object to and seek review of this Report and Recommendation, but must act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Filing objections which raise some issues but fail to raise others with specificity will not preserve all objections that a party might have to this Report and Recommendation. *Willis v. Sec'y of Health and Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to Rule 72.1(d)(2) of the *Local Rules of the United States District Court for the Eastern District of Michigan*, a copy of any objection must be served upon this Magistrate Judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

Dated: January 30, 2015          s/ Mona K. Majzoub
                              MONA K. MAJZOUB
                              UNITED STATES MAGISTRATE JUDGE

23

## **PROOF OF SERVICE**

I hereby certify that a copy of this Report and Recommendation was served upon Counsel of Record on this date.

Dated: January 30, 2015          s/ Lisa C. Bartlett
                                                          Case Manager